UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| BRICE S. CODY, | ) | Civ. 11-4123-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION |
| vs. | ) | AND ORDER GRANTING |
| | ) | SUMMARY JUDGMENT |
| PRAIRIE ETHANOL, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Brice S. Cody, brought this cause of action against defendant, Prairie Ethanol, LLC (POET), alleging claims of disparate treatment, failure to accommodate, and retaliation under the Americans with Disabilities Act (ADA) and discrimination under South Dakota law following his termination from employment with POET. Docket 1. POET moves for summary judgment and claims that there is no genuine dispute in material fact that remains for trial because Cody cannot show he was a qualified individual under the ADA, that his termination was not causally connected to his disability, and he cannot establish pretext; thus, dismissal is appropriate. Docket 37. Cody resists the motion and argues that there are genuine issues of material fact for all claims that preclude summary judgment, including direct and indirect evidence of discrimination and a failure to accommodate his disability. Docket 50. For the following reasons, the court grants POET's motion for summary judgment.

## BACKGROUND

The undisputed facts, viewed in the light most favorable to Cody, the nonmoving party, are as follows:

POET is a manufacturing business with 27 plants that turn corn into ethanol for use in vehicles. POET's corporate headquarters is located in Sioux Falls, South Dakota. The POET plant at issue is located in Mitchell, South Dakota. Cody was hired as a plant operator for the Mitchell POET plant around November 3, 2006.

The POET plant runs on a two-shift scheme. Within each shift the plant typically employs a lead operator and two plant operators, among other employees. The lead operator typically works in the computerized control room in the center of the plant that controls the machines. The plant operators work in three sections: distillation, fermentation, and dryers. Biorefining plants like the POET plant have a tendency to swing, which means that the machines in the plant can slow down or speed up based on a number of different factors. The plant operators make adjustments to keep the plant machinery running level, and often the operators have to make quick changes to prevent the plant from swinging. These swings can also cause employees to "lose the plant." Either a swing or losing the plant causes the plant to slow down or go offline, which can result in a significant loss to the plant's production.

There are a number of positions at POET that are above lead operators and plant operators. Cody's supervisor at POET was night supervisor Bob

Riggs. Riggs reported to Operations Manager Rick Schauer. Schauer reported to Technical Manager Becky Pitz, and Pitz reported to the General Manager Dean Frederickson. Managers at the Mitchell POET plant have to get approval to hire or fire employees from the POET Sioux Falls Human Relations office.

South Dakota is an employment at-will state. The POET employee handbook notes as much and contains a Disciplinary Action Policy that provides that "Although employment with POET Biorefining is . . . at will, . . . POET Biorefining may use progressive discipline at its own discretion."

In February of 2007, Cody received his first performance assessment as a plant operator. Overall, Cody's performance met expectations but did not exceed expectations or operate below expectations. Docket 39-13. In the evaluation it was noted that Cody needed "to exhibit some tact about certain discussions" and "work on his tact when new challenges and assignments come to the surface. He needs to not react so fast and make sure to incorporate change into his style of operation." *Id.* It was recommended that Cody continue to work on his communication skills and to develop relationships with the rest of the teams.

On June 11, 2007, Cody was injured while at work. Specifically, he "hit his hardhat on the cross beam of the metal storage rack jerking his neck back." Docket 39-4 at 1. As a result, Cody's doctor recommended that Cody have the following work restrictions: a 10-pound lifting limitation, ground work only, no over-the-shoulder work, and minimal bending or twisting of his neck and

back.[1] Cody requested that POET accommodate his injuries by allowing him to work within his doctor's restrictions. There is no dispute that Cody notified POET of his injuries or that POET accommodated Cody's work restrictions from June of 2007 through August of 2008.

On August 22, 2007, Cody was promoted to one of the lead operator positions. Collectively, Schauer, Frederickson, and Pitz select the lead operator. The lead operator must be an effective communicator to get the job. Soon after his promotion, Cody had surgery in December of 2007 to help correct issues in his neck from his original work injury. POET gave Cody a leave of absence to have the surgery and to recover. Cody returned to work in March of 2008.

Meanwhile, beginning in the fall of 2007, POET management had to discuss issues with Cody that related to his negative job performance. First, around September 10, 2007, Schauer spoke to Cody about the way he was running distillation as lead operator. Schauer told Cody he had bad habits he needed to break. Then around November 15, 2007, Cody made changes to the recycle screw, and Cody admitted that his changes caused the dryer to swing wildly. Schauer and Cody discussed this event, too. Around this same time period Schauer and Pitz also told Cody that he could not take his prescription narcotic pain medication while at work even if it was prescribed by his physician. Cody changed his medication as a result of this discussion.

---

[1] While Cody's restrictions fluctuated over time, Cody had some form of restrictions related to his neck and back for the duration of his employment with POET following his injury.

4

Cody received his only performance evaluation as lead operator in December of 2007. Generally, the evaluation noted that Cody met or exceeded expectations. Docket 49-14 at 2-3. The evaluation also provided that "Brice needs to continue working on his communication skills. Use more tact when communicating with subordinates, peers, and management." *Id.* at 2. Cody was also told to "[c]ontinue to develop interpersonal relationship skills. Embrace the entire plant as his team not just his crew," "[c]ontinue to develop communication skills," and to "[g]et through the year without any incidents. (safety)." Docket 49-14 at 3.

Around August 19, 2008, Schauer and Cody had another discussion about issues with his negative performance. They discussed Cody's style of running the plant, the fact that Cody had skipped samples, and that Cody wrote comments in the log book that did not support teamwork. Schauer told Cody that this conversation was a verbal warning. Cody acknowledges that he told other operators that management did not know how to run the plant. Docket 39-1 at 12. Cody also admits that he called another employee an "ass" in the log book while he was a lead operator. *Id.*

On September 10, 2008, Cody was suspended, demoted, and placed on a Performance Improvement Plan (PIP). POET listed the reason for demotion as "Team work unbecoming of being a Lead Operator." The PIP listed plant operations and work place etiquette as areas where Cody's performance needed improvement. Specifically, the PIP said that "Brice has shown unacceptable

performance and behavior in regards to showing disrespect to fellow employees and plant operations." Docket 49-16 at 1. The PIP also noted that Cody needed to run the plant consistently and "lead by example, show respect to fellow employees. No derogatory language." *Id.* Under the PIP Cody was to show improvement or it would "require further disciplinary action up to and including termination." *Id.* at 2.

Following demotion and being placed on a PIP, Cody was assigned to Art Mueller's crew. On October 23, 2008, Cody successfully completed his PIP. On November 1, 2008, Cody nearly lost the plant. The reasoning for how Cody nearly lost the plant is disputed, but Cody admitted that he was at fault in the shift log book. Cody stated, "I really screwed up . . . Don't know how we managed not to loose [sic] the plant. Good help I guess . . . Would have been a good night. Should have left well enough alone. Totally me at fault." Docket 39-9. Around two weeks later, Schauer spoke to Cody again and stated that Cody was making too many changes to the machines.

In November of 2008, Cody received his final performance assessment from POET as a plant operator. Cody's total score was a 1.9, which was below the 2.0 score necessary to be eligible for a raise and fell below expectations. Cody's lowest score was under the section that related to POET's company value that "We are all on the Same Team." Under the comment section, the assessment said that "Brice needs to continue to work on his diplomacy when communicating with the opposite crew." Docket 39-22 at 1. Cody's job-related

goals and objectives included improving his interpersonal skills and keeping safety at the forefront of his actions. *Id.* at 2.

On December 25, 2008, Cody again made changes to the plant's machines that caused problems. Cody admitted as much in the shift log book. He stated: "Rick & Bob: This is Brice. Sorry man. I'll save you the trouble of trending the Dryers. All I did is take one point of Recycle off on A. And I Had to pay for it all night while we got a new ferm. Next time if they are Running good I won't touch em." Docket 39-23.

As a result of Cody's low score from his November assessment, Cody was placed on a Performance Management Plan (PMP) on January 7, 2009. A PMP is similar to a PIP. Cody's PMP stated that the main area where he needed improvement was teamwork, but he also scored low in a number of other categories. Docket 39-24. Other areas where Cody needed to show improvement were in exhibiting tact, cooperation with dignity and respect, fostering team work, and running the plant without causing swings. *Id.* at 1. The PMP also stated that POET is an at-will employer, Cody was expected to show improvement in work performance, and failure to show improvement within the specified timelines would require further disciplinary action that could include termination. *Id.* at 2.

POET terminated Cody's employment on January 21, 2009. The specific reasoning for termination, as explained in Cody's termination document, was "[b]ecause of Brice's history of concerns and lack of sustained improvement, in

addition to the most recent operational incident dated December 25, 2008, Brice is terminated from employment effective immediately." Docket 39-25 at 2. POET also stated that "Brice's past performance, behaviors and communications with the team has had a negative impact on his co-workers, teamwork, and overall plant operations." *Id.*

On May 29, 2009, Cody filed a charge of discrimination against POET with the South Dakota Division of Human Rights. Docket 1-1. Cody received his right to sue letter from the Equal Employment Opportunity Commission on June 1, 2011. Docket 1-2. Cody brought this cause of action against POET on August 26, 2011. Docket 1.

## STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of . . . demonstrat[ing] the absence of a genuine issue of material fact." (internal quotations omitted)). The moving party must inform the court of the basis for its motion and also identify the portion of the record that shows that there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

Once the moving party has met its initial burden, the nonmoving party must establish "that a fact . . . is genuinely disputed" either "by citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c). "The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.' " *Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). For purposes of summary judgment, the facts, and inferences drawn from those facts, are "viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## DISCUSSION

## I.    Americans with Disabilities Act

Cody alleges three separate claims under the ADA:[2] discriminatory disparate treatment, failure to make a reasonable accommodation, and

---

[2] Congress enacted amendments to the ADA in 2008, which became effective January 1, 2009. ADA Amendments Act (ADAAA) of 2008, Pub. L. No. 110-325, § 8, 122 Stat. 3553, 3559 (2008). The ADAAA "broadened the definition of what constitutes a disability[.]" *Nyrop v. Indep. Sch. Dist. No. 11*, 616 F.3d 728, 734 n.4 (8th Cir. 2010). Assuming without deciding, the court finds that the ADAAA is applicable to Cody's termination claim because Cody was terminated on January 21, 2009. The ADA would apply to Cody's demotion because that occurred in 2008. Regardless, the court's analysis and conclusion would be the same under either version of the Act.

retaliation. Each claim must be analyzed separately. *Fenney v. Dakota, Minnesota & Eastern R.R. Co.*, 327 F.3d 707, 712 n.6 (8th Cir. 2003).

### A.      Discriminatory Disparate Treatment

A plaintiff can prove a discrimination claim under the ADA with either direct or indirect evidence. *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1021 (8th Cir. 1998). Cody argues that he can create a genuine dispute in material fact on his disparate treatment claim with both direct and indirect evidence of discrimination.

### 1.      Direct Evidence

The Eighth Circuit Court of Appeals has stated that direct evidence is that which displays " 'a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.' " *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012) (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)). Direct evidence does not refer to whether it is circumstantial evidence, but " 'refers to the causal strength of the proof.' " *Id.* Direct evidence "most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861 (8th Cir. 2009). Plaintiffs who lack evidence that "clearly points" to an illegal motive must create the inference of unlawful discrimination through the familiar burden shifting analysis of *McDonnell Douglas*, including by

10

establishing evidence of pretext. *St. Martin*, 680 F.3d at 1033 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)).        As proof of direct evidence, Cody states that Pitz asked him almost every day once he came back from his surgery when he would be taken off restrictions. Cody claims that Pitz said they needed to have him back to full duty. Cody also states that Schauer and Pitz told him that he could not take his physician-prescribed pain medication while at work, which displays POET's discriminatory animus against people with disabilities. Cody argues that comments from supervisor Mueller that he needed to "carry his own weight" establishes direct evidence of discrimination. Cody also alleges that his supervisor was uncomfortable with other coworkers complaining to management about his accommodations. Finally, Cody asserts that Frederickson and members of POET's human resources department revised Cody's performance evaluations and other paperwork to remove details of any disability-related information in preparation for litigation. Docket 50 at 11-12.

The court finds that Cody's proffered evidence does not rise to the level of direct evidence. None of this evidence provides a *direct* link between POET's alleged discriminatory animus and an adverse employment decision regarding Cody. At this point, a reasonable fact finder could not find that the adverse employment decisions were actually motivated by an illegitimate criterion.

Even if Pitz had asked Cody when he would be off restrictions, the court will not infer a discriminatory animus in these statements under a direct

evidence analysis. An employer can "make inquiries into the ability of any employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B). It was well within the spectrum of normal activity for Pitz to inquire into Cody's ability to lift or perform other essential functions of his position. Moreover, while Pitz may have been a decisionmaker who was involved in the process to terminate Cody, any alleged statements by Pitz asking Cody when he would be off restrictions would be unrelated to the decisional process. *See St. Martin*, 680 F.3d at 1036 (" 'We have carefully distinguished between comments which demonstrate a discriminatory animus in the decisional process or those uttered by individuals closely involved in employment decisions, from stray remarks in the workplace, statements by nondecisionmakers, or *statements by decisionmakers unrelated to the decisional process.*' ") (emphasis added) (quoting *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006)). Comments made by a person other than Pitz, Schauer, or Frederickson would be a stray remark by a nondecisionmaker and not direct evidence of discrimination. *Id.*

Finally, there is no evidence whatsoever that POET doctored Cody's records to hide evidence, and his bald assertion that POET did so is insufficient to create a genuine dispute in material fact. *See Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 857 (8th Cir. 2012) ("A party's unsupported self-serving allegation that her employer's decision was based on retaliation does not establish a genuine issue of material fact."). The remaining evidence, even if viewed in the light most favorable to Cody, does not display direct evidence

12

between Cody's neck injury accommodations and the reason for his termination. Thus, Cody has not established direct evidence that clearly points to an illegal motive or that POET used unlawful discrimination in terminating Cody's employment.

### 2.   Indirect Evidence

To make a prima facie case of discrimination under the ADA, an employee must establish: (1) that he has a disability as defined in the Act; (2) that he is qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) that he has suffered an adverse employment action on the basis of his disability.[3] 42 U.S.C. § 12112(a); *see also Cravens v. Blue Cross & Blue Shield of Kansas City*, 214 F.3d 1011, 1016 (8th Cir. 2000). If Cody makes this showing, the burden shifts to POET to rebut this presumption by articulating a legitimate, nondiscriminatory reason for the adverse employment action. *Young*, 152 F.3d at 1021. If POET rebuts the presumption, the burden shifts back to Cody to show that POET's proffered reasons are merely pretext for discrimination. *Id.*

For purposes of this summary judgment motion, POET does not dispute that Cody has a disability within the meaning of the ADA and that Cody suffered two adverse employment actions: demotion in September of 2008 and

---

[3] As a result of the ADAAA, the causation element was amended to prohibit an employer from discriminating against a qualified individual "on the basis of disability" as opposed to the previous prohibition against discrimination "because of the disability."

termination of employment in January of 2009. Docket 38 at 9. POET asserts, however, that Cody cannot show that he was a qualified individual with a disability or establish a causal connection between his disability and these adverse employment actions.

### a.     Qualified Individual

To satisfy the second element of the prima facie test, Cody must first show that he "meets the necessary prerequisites for the job, such as education, experience, and training," and second, that he "can perform the essential job functions, with or without reasonable accommodation." *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 674 (8th Cir. 2001) (citing *Land v. Wash. Cnty., Minn.*, 243 F.3d 1093, 1095 (8th Cir. 2001)). Cody satisfies the first prong by virtue of having previously held the position. *Id.* And POET does not dispute that Cody had the skill, education, experience, and training for the job. Moving to the second prong, POET claims that Cody was not a qualified individual because he could not perform the essential functions of the job with or without accommodation.

"The term essential functions means the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2.; *see also Duello v. Buchanan Cnty. Bd. of Supervisors*, 628 F.3d 968, 972 (8th Cir. 2010). Relevant evidence to be considered as to whether a particular function is essential is:

> (i) [t]he employer's judgment as to which functions are essential; (ii) [w]ritten job descriptions prepared before advertising or

14

> interviewing applicants for the job; (iii) [t]he amount of time spent
> on the job performing the function; (iv) [t]he consequences of not
> requiring the incumbent to perform the function; (v) [t]he terms of
> a collective bargaining agreement; (vi) [t]he work experience of past
> incumbents on the job; and/or (vii) [t]he current work experience
> of incumbents in similar jobs.

*Kallail v. Alliant Energy Corporate Servs., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012) (citation omitted) (quoting 29 C.F.R. § 1630.2(n)(3)). "The employer's judgment about an essential job function 'is considered highly probative.' " *Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 914 (8th Cir. 2013) (quoting *Duello*, 628 F.3d at 972). While Cody must present evidence that he is qualified, POET must first identify the fundamental job duties. *Chalfant v. Titan Distrib., Inc.*, 475 F.3d 982, 990 (8th Cir. 2007).

POET says the following functions were essential duties of plant operators and lead operators: maintaining a team environment, making adjustments to optimize plant operation, and striving for maximum efficiency in plant operations. POET maintains that the job descriptions for both positions include teamwork functions, and teamwork is essential because operators are continuously working with others to keep the plant running efficiently. Operators and lead operators are evaluated in their performance assessments under the first criterion of "We are all on the Same Team." Additionally, POET states that at least one other plant employee was terminated in the past for poor teamwork. Assuming without deciding that teamwork is an essential function, the court finds that viewing the evidence in

15

the light most favorable to Cody, he has presented sufficient evidence to show that he can complete the essential duties of his job.

While there is no dispute in fact that Cody received a number of bad reviews or performance evaluations that dealt with his ability to engage in teamwork, there is no conclusive proof that Cody was physically or mentally unable to complete those tasks. Furthermore, there is evidence in the record that at different points during his employment with POET, Cody was described as "a great team player," that he "works well with his team to achieve the common goal," and that he "is a good communicator." Docket 49-8 at 2.

POET also argues that Cody could not perform other essential functions of his positions, including making adjustments to optimize plant operation and striving for maximum efficiency in plant operations. Like teamwork, however, there is evidence in the record that suggests that Cody could complete these fundamental tasks both prior to his injury and after. For instance, in Cody's February of 2008 assessment, POET noted that Cody "is a great dryer operator that will work his way into becoming an excellent overall operator." Docket 49-8 at 3. Additionally, in Cody's November of 2008 assessment, POET acknowledged that "Brice has come up with some great ideas over the past year" in relation to running the plant. Docket 39-22 at 2. The court finds that Cody has presented sufficient evidence to show he was qualified to perform the essential functions of his positions.

### b.   Adverse Employment Action on the Basis of Disability

POET contends that Cody cannot establish a causal connection between his disability and his adverse employment actions. The court disagrees. Under the third element of establishing a prima facie case in an ADA context, Cody must show that he "suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination." *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 777 (8th Cir. 2012). Specifically, "the disability must be a motivating factor in the employer's decision for the adverse action." *Chalfant*, 475 F.3d at 991.

Here, the decision to terminate Cody occurred soon after his physician concluded that Cody would need to remain on restrictions for another two or three months in December of 2008. Cody was terminated in January of 2009. Schauer knew that Cody would continue to require additional months of restrictions. Schauer also admitted that he did not think that POET could accommodate a permanent lifting restriction for a plant operator because these employees have to be able to lift over 50 pounds to do the job. This temporal connection between Cody's need for extended work accommodations and the timing of his termination coupled with uncertainty about POET being able to provide permanent accommodation to an employee is sufficient for a reasonable jury to conclude that Cody's disability was a motivating factor in POET's termination decision at this stage of the burden shifting test. Thus,

Cody has made his prima facie showing, and the burden now shifts to POET to articulate a nondiscriminatory reason for its actions.

### 3.    Nondiscriminatory Reasons

POET asserts that Cody's demotion and termination were each based upon ongoing and documented behavioral and performance issues about which Cody was repeatedly counseled and that violated POET's company policy. Docket 38 at 14. POET has a policy that employees must treat others appropriately and perform duties satisfactorily.[4] POET stated that Cody routinely failed to treat coworkers appropriately and failed to perform his duties when he caused the plant to swing on at least two occasions and that he operated the plant erratically. The Eighth Circuit "has consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee." *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006) (citation omitted). Accordingly, this stated reason is sufficient to

---

[4] POET's Disciplinary Actions Policy provides:

Employees of POET Biorefining are required to conduct themselves in a positive and professional manner while fulfilling the requirements of essential functions of the position. This includes performing duties satisfactorily, maintaining good attendance, treat[ing] others appropriately, and epitomizing POET Biorefining's values and mission. . . . Although employment with POET Biorefining is based on mutual consent and both the employee and POET Biorefining have the right to terminate the employment at will, with or without cause or advance notice, POET Biorefining may use progressive discipline at its own discretion.

Docket 39-3 at 7.

shift the burden back to Cody to establish that POET's stated reasons are mere pretext to hide a discriminatory intent.

### 4.    Pretext

The Eighth Circuit has reiterated that at this stage of the burden shifting test:

> To demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason. . . . [T]he plaintiff must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination.

*McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008) (quoting *Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998)). Put another way, a plaintiff must show "that a discriminatory animus lies behind the defendants' neutral explanations." *Id.*

Cody cannot carry his burden of establishing that POET's articulated reasons for terminating his employment or demoting him were false. Cody agrees that he was repeatedly counseled for issues dealing with behavior and performance. Cody agrees that he was demoted because he used inappropriate language about another coworker and disparaged management's competency to coworkers. Cody admits that he was frequently told to improve his teamwork, tact, and communication skills. Cody acknowledges that he let the plant swing on at least two documented occasions even though he had been told to be less aggressive when operating the plant. Essentially, Cody admits that the majority

of incidents or conduct upon which POET based its termination and demotion decisions are true.

Thus, Cody cannot overcome POET's articulated reasons when he has an absence of substantial evidence of pretext. *See Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005) ("An employee's attempt to prove pretext . . . requires more substantial evidence than it takes to make a prima facie case, . . . because unlike evidence establishing a prima facie case, evidence of pretext . . . and retaliation is viewed in light of the employer's justification.") (citations and quotations omitted). The court will not second guess POET's decision to terminate Cody based on these performance or behavioral issues. *See Russell v. TG Mo. Corp.*, 340 F.3d 735, 746 (8th Cir. 2003) (stating that the court will not "sit as a 'super-personnel department' with the power to second-guess employers' business decisions.").

Cody asserts that he has established pretext because other similarly situated but non-disabled employees of POET engaged in similar conduct but were not terminated. The court finds that this rationale is not applicable to the employees Cody identifies because he failed to carry his "burden of proving that he and the disparately treated [employees] were similarly situated in all relevant aspects." *McNary*, 535 F.3d at 770 (internal citations and quotations omitted). Cody either had a different supervisor than the employee, engaged in conduct that was dissimilar to these coworkers, or had the distinguishing circumstances of having been warned or counseled about his conduct and

20

being placed on a PIP twice while they were not. *See Tolen v. Ashcroft*, 377 F.3d 879, 882 (8th Cir. 2004) (noting that being similarly situated means the employees "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."). These reasons prevent Cody from establishing pretext through similarly situated coworkers.

    Because Cody failed to raise a genuine dispute in material fact on the issue of pretext within his disparate treatment claim, summary judgment is granted in favor of POET on this claim.

### B.    Failure to Make Reasonable Accommodation

Cody also alleges that POET discriminated against him because it failed to make a reasonable accommodation of his disability in violation of the ADA. An employer's failure to make a reasonable accommodation to a disabled employee is a form of prohibited discrimination under the ADA. *Fenney*, 327 F.3d at 711 ("The ADA mandates that companies . . . provide reasonable accommodations to the known physical limitations of an otherwise qualified individual with a disability who is an employee[.]"). A failure to accommodate claim is analyzed under a "modified burden-shifting analysis" as opposed to the *McDonnell Douglas* burden-shifting analysis. *Id.* at 712. Under the modified burden-shifting analysis, Cody must make a facial showing that he has an ADA disability, has suffered an adverse employment action, and is a qualified individual. *Id.* Thus, a failure to accommodate claim does not turn on the issue

21

of an employer's intent or actual motive, but "discrimination occurs when the employer fails to abide by a legally imposed duty." *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004).

Once the plaintiff makes a facial showing that he is a qualified individual and is able to perform the essential functions of his job with or without accommodation, then the burden of production moves to the employer to establish that it is unable to accommodate the employee. *Fenney*, 327 F.3d at 712. "If the employer can show that the employee cannot perform the essential functions of the job even with reasonable accommodation, [then] the employee must rebut that showing with evidence of his individual capacities." *Id.* (citation omitted). Finally, the employee's burden merges with the overall burden of convincing the trier of fact that he was unlawfully discriminated against. *Id.*

Additionally, if an employee requests an accommodation, the employer must engage in an interactive process to determine whether the parties can find and agree upon an accommodation. *Ballard v. Rubin*, 284 F.3d 957, 960 (8th Cir. 2002). To survive summary judgment the plaintiff must prove that: "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Id.* (citations and quotations omitted).

22

The parties do not dispute that Cody told POET about his disability and that he had a lifting and overhead work restriction in place from the date of his injury in June of 2007 until his termination in January of 2009. It is uncontroverted that Cody's requested accommodations were met from June of 2007 through August of 2008. Now Cody argues that he was unlawfully discriminated against because POET withdrew the reasonable accommodations that it had already been providing Cody.

Cody says that there were at least two examples where his accommodations were not met. The first is an instance where Cody allegedly helped several other employees lift a 200-pound valve in an emergency situation at some unidentified date when he was a lead operator. The second is when Cody's direct supervisor after his demotion, Mueller, allegedly required him to lift an object that was above his lifting restriction.

In the first example, Cody did not establish that any POET employee forced him to work beyond his restrictions or that the lifting was done at the behest of any POET employee when Cody was himself the lead operator at the time. As to the second event, even if true, one isolated instance is not sufficient evidence to show that POET would not accommodate Cody's work restrictions, particularly when it is undisputed that POET had accommodated Cody's work restrictions for over a year. Cody failed to bring forth evidence that raises a genuine dispute in fact as to whether POET engaged in a good faith effort to provide Cody with the requested accommodations.

Cody also cannot meet his ultimate burden of establishing that he was unlawfully discriminated against when the evidence suggests that POET attempted to work with Cody as to his neck injury and the related work restrictions by allowing him to work on distillation, which was the lightest duty possible, and allowing Cody months off of work to have surgery and recover. Cody has not pointed to any evidence in the record that would create a dispute in fact as to whether he could have reasonably been accommodated but for POET's lack of good faith effort. Accordingly, Cody's failure to accommodate claim fails.

## C.    Retaliation

Cody alleges that POET terminated his employment in retaliation for his request to Schauer that he reinstate Cody's previous accommodations after Mueller disregarded them. The retaliation provision of the ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation." 42 U.S.C. § 12203(a). To establish a prima facie case of retaliation, Cody must show that: "(1) he engaged in protected conduct, (2) he suffered a materially adverse employment action, and (3) the adverse action was causally linked to the protected conduct." *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011). If this prima facie case is met the burden shifts to the employer to establish a nonretaliatory reason for the adverse

24

employment action. *See Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042-43 (8th Cir. 2007). If this burden is met then the burden shifts back to the plaintiff who must establish that the stated reason was pretext or that creates a reasonable inference that the employer acted in retaliation. *Id.*

Cody initially argued that his retaliation claim was based, in part, on his EEOC complaint that was filed after his termination, but Cody has since waived that argument. Now, Cody argues that his retaliation claim stems from his request to Schauer that he reinstate Cody's accommodations after Mueller "effectively eliminated them." Even if Cody could make his prima facie showing of retaliation under the ADA, his claim still fails because (as previously discussed) Cody cannot establish a genuine dispute in material fact on the issue of pretext. *See Stewart*, 481 F.3d at 1042-43 (stating that retaliation claims under the ADA are analyzed under the *McDonnell Douglas* burden-shifting test if there is no direct evidence of retaliatory motive). Accordingly, summary judgment in favor of POET is appropriate on Cody's retaliation claim.

## II.  Discrimination Under South Dakota Law

Cody brought a discrimination claim under South Dakota law, specifically, SDCL 20-13-10, which tracks an ADA discrimination claim. This court has previously stated that "[a]lthough it appears to be an issue of first impression, the court finds that the South Dakota Supreme Court would likely look toward federal jurisprudence in interpreting SDCL 20-13-10." *Petersen v. ProxyMed, Inc.*, 617 F. Supp. 2d 835, 845 (D.S.D. 2008) (citing *Lenhardt v.*

25

*Basic Inst. of Tech., Inc.*, 55 F.3d 377, 379 (8th Cir. 1995)). Accordingly, POET's motion for summary judgment as to Cody's state-law claim is granted for the same reasons as explained under the court's ADA disparate treatment analysis.

### CONCLUSION

Cody failed to establish a genuine dispute in material fact as to all of his ADA claims and his South Dakota claim that parallels the ADA. Summary judgment is granted in favor of POET on all claims. Accordingly, it is

ORDERED that POET's motion for summary judgment (Docket 37) is granted.

Dated June 26, 2013.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE